**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MDT SERVICES GROUP, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:12-cv-1080** |
| | ) | |
| **CAGE DRYWALL, INC.** | ) | **Judge Sharp** |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this action, Plaintiff MDT Services Group, LLC ("MDT") seeks damages from Defendant Cage Drywall, Inc. ("Cage") arising out of the following causes of action: "(1) breach of express and implied contract; (2) promissory estoppel; (3) quantum meruit; (4) unjust enrichment; (5) tortious interference with contractual relations; and (6) promissory fraud." (Docket No. 1 at 1).

After denial of Defendant's Motion for Summary Judgment and later Motion to Dismiss, the Court held a bench trial on July 15-17, 2014, after which the Parties were instructed to file proposed findings of fact and conclusions of law, and any responses thereto. The last such filing was entered by Defendant on September 22, 2014.

Having reviewed the Parties' proposed findings and conclusions, their arguments, the record, exhibits received in evidence, and testimony of the witnesses after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has

been rejected in favor of the specific fact found.  Further, the Court omits from its recitation facts that it deems immaterial to the issue presented.

## I.  **FINDINGS OF FACT**

1.  Plaintiff is a Georgia limited liability company that offers temporary employment placement services connecting skilled laborers with construction subcontractors.

2.  Defendant is a Tennessee corporation and construction subcontractor that specializes in drywall services.

3.  Defendant was hired as a subcontractor by Turner Construction in 2010 to provide framing, drywall, and acoustical ceilings for construction of a hospital in Owensboro, Kentucky (the "Owensboro Project").  This ten-story, $600 million hospital was the largest project Defendant had ever undertaken.

4.  Plaintiff contacted Defendant around the end of August 2011.  Their subsequent negotiations resulted in the Parties' first contract, which defined hourly rates for each class of worker (e.g., mechanic, hanger, finisher, etc.) that Plaintiff would send to the Owensboro Project.

5.  Defendant paid Plaintiff directly.  Plaintiff, in turn, paid a portion of the hourly rate to each worker as a base rate, plus per diem.  Plaintiff also paid a portion of workers' housing costs when they relocated to a hotel or apartment near the work site.  However, because Plaintiff hired its employees as "independent contractors", they were not paid overtime wages.[1]

6.  The first MDT employees reported to Owensboro on September 11, 2011.

---

[1] Defendant's Exh. 4.

7. From September to December 2011, 50 to 80 laborers from MDT worked on the Owensboro project each week. The majority of laborers were provided by other companies, first Rimax and later Intercontinental.

8. The Parties' relationship was not entirely smooth during this period. Defendant received complaints from workers who were fined by Plaintiff for infractions like "tardiness, failure to appear at the designated job site, failure to notify MDT of unavailability, underperformance, and lack of productivity."[2]

9. For its part, Plaintiff complained that Defendant did not adhere to the agreed payment schedule. Defendant had originally paid Plaintiff on a weekly basis, as Plaintiff paid its workers. Over time, Defendant's payments become increasingly intermittent – first biweekly and then monthly. Plaintiff engaged a factoring company to fund the payroll.

10. At the end of November, Defendant began cutting back the number of MDT workers on the Owensboro Project. Riley Kinzer, Cage Project Superintendent, notified MDT in an email dated December 5, 2011, that "due to the progression of the job not being what it should we had to make a big cut in the number of employees" and MDT's services were no longer required.[3]

11. However, two days later, Defendant requested Plaintiff return as the primary labor supplier on the Owensboro Project. A recent Homeland Security investigation had revealed workers from Intercontinental lacked I-9 forms for employment eligibility verification. Unlike

---

[2] Defendant's Exh. 2. This contract also included a non-compete clause.

[3] Plaintiff's Exh. 15.

Intercontinental, Plaintiff used E-Verify to confirm the legal status of each worker before they entered the job site.[4]

12. Plaintiff agreed to take over worker supply but faced regulatory compliance challenges of its own. At the end of November, MDT was audited by the Kentucky Labor Cabinet and United States Department of Labor ("DOL"), revealing its workers had been improperly hired as independent contractors. Instead, the workers qualified as statutory employees subject to the requirements of the Fair Labor Standards Act ("FLSA"), including statutory overtime pay.

13. In light of these developments, the Parties renegotiated and drafted a subsequent contract (the "final contract").[5] The final contract defined new hourly rates "[for] all projects where MDT provides manpower for Cage Drywall except for projects requiring certified payroll reporting,"[6] higher than the rates in the original contract, as well as an overtime rate to comply with FLSA requirements. The final contract also included a "non-solicitation/no-hire" provision, in which Defendant agreed not to "solicit to hire, or in any way engage, contract or hire" MDT's employees while the contract was in force and for one year after.[7]

---

[4] E-verify is an Internet-based system offered by U.S. Citizen and Immigration Services "that compares information from an employee's Form I-9, Employment Eligibility Verification, to data from U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility." *What is E-Verify*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, http://www.uscis.gov/e-verify/what-e-verify (last visited Feb. 3, 2015). Mr. Kinzer asserted in his deposition taken on July 14, 2014, that many of the workers from Intercontinental who were terminated promptly returned with MDT. (Docket No. 69 at 12). He based this claim on his recollection of workers' faces but offered no further evidence. Plaintiff disputes this allegation.

[5] Plaintiff's Exh. 13. The Parties first drafted a contract on December 8, 2011, which contained a slightly higher hourly rate but no overtime provision. This contract was never implemented and was quickly replaced by the final contract.

[6] Id.

[7] Id. ("**Non-Solicitation/No-Hire Covenant.** CAGE DRYWALL INC understands and agrees that MDT will expend significant time and resources in recruiting, qualifying, hiring, training its employees. In recognition thereof, and to ensure MDT continues such efforts, CAGE DRYWALL INC hereby agrees that during the term of its Agreement with MDT, and for a period of one (1) year following the termination of this Agreement, that it will not, directly or indirectly, by, as or through any affiliate or related companies, employees, officers, directors,

14. Work in Owensboro continued on schedule. January was Plaintiff's busiest month on the project, with over 100 MDT workers on the job and weekly net profits over $30,000, three times the net profit of prior weeks.[8]

15. Yet, despite the project's success, Plaintiff sent a letter to its employees the week of January 23, 2012, informing them that "[d]ue to the high amount of payroll in the recent work weeks starting next week [MDT is] temporary [*sic*] forced to move our pay period on two weeks in hold. This means that the current week (01/23-01/29) wages will be paid on 02/10/2012. You will not have a check next week."[9]

16. Mr. Ivanov and MDT CEO Luis Nunez travelled to Owensboro shortly after the letter was sent. They met with their employees on the Owensboro Project to explain the circumstances of the delay and offer cash advances to those who needed them. Mr. Nunez testified that just a few workers requested advances.

17. The Parties' respective versions of subsequent events differ. According to Mr. Ivanov, when the workers arrived on site on Monday, February 1, following the news of the pay delay, Defendant presented them with two time sheets – the usual MDT sheet and a new Cage time sheet. Cage management allegedly informed the workers that if they signed the MDT time sheet, they would no longer have jobs.

18. This account was largely supported by the testimony of witnesses employed by MDT on the project. As explained by Joseph Cox, a drywall hanger and finisher who began working for MDT at Owensboro around November 2011, and subsequently joined Cage at the end of

---

members, subcontractors or owners, solicit to hire, or in any way engage, contract or hire, the employees supplied by MDT.")

[8] Plaintiff's Exh. 18.

[9] Defendant's Exh. 1.

January 2012, "Monday morning when I got to the job, there was [*sic*] two papers on the table. You sign this one [MDT], you're fired; if you sign this one [Cage], you're hired."[10] "[Cage] didn't want us to quit or they didn't want us to get fired. They wanted us to stay and work for them, so we signed in for them that we would have a job."[11]

19. The number of MDT employees at the Owensboro site immediately dropped as workers moved to Cage. As of the first week of February, MDT retained only 16 workers and weekly net profits had fallen to $2,600.[12]

20. Supervisors at Cage, including Mr. Kinzer, knew that at least some of the workers hired in February 2012 were from MDT. However, at that time, Defendant's highest priority was ensuring the project was properly staffed.

21. Defendant offers inconsistent testimony regarding how it hired MDT employees. Mr. Kinzer claims that when their pay was delayed, MDT workers approached Ramon Zuniga of Ponce Drywall, another Cage subcontractor, requesting to continue on the Owensboro Project. Mr. Kinzer also stated in his deposition that the morning the workers received the letter from MDT, he met "probably 100 employees standing at [his] job trailer with these letters in hand refusing work because they wasn't [*sic*] being paid."[13] Because Mr. Kinzer did not testify at the bench trial, the Court has no basis on which to judge his credibility or demeanor.

22. Mr. Zuniga testified that after disgruntled MDT workers approached him for work, he contacted Cage, who agreed to hire the workers and paid Mr. Zuniga a commission fee.

---

[10] Docket No. 71 at 153.

[11] Id. at 142.

[12] Plaintiff's Exh. 5.

[13] Docket No. 69 at 25.

23. Chris Loftis, Cage Superintendent, testified that the Monday after MDT notified workers of the delay in pay, approximately 85 of the 100 MDT workers failed to arrive on site. He believed they had quit and were not coming back. While workers did filter back in over the coming weeks, it took over a month to restore the labor force to full operation and the project fell behind.

24. John Carter, Senior Vice President of Cage, testified that Cage had trouble building back up its labor force after MDT workers walked out and depended on Ponce Drywall to supply new labor. Though he claimed to have "no idea" where the new workers came from,[14] he also testified he recognized workers who moved from Intercontinental to MDT and "some familiar faces" from MDT when Ponce brought in workers in February 2012.[15]

25. Mr. Carter testified that if he had known the workers returning to the site were former MDT employees, he "would have tried to have avoided" hiring them, not because of the non-solicitation provision in the Parties' contract, but because Defendant had "too many problems" with the workers complaining about deductions from their MDT paychecks.[16] However, because Cage "was at a critical point in the job" Mr. Carter "didn't tell [his] guys to make sure that there are no MDT employees or former MDT employees" when they supplemented the crew.[17]

26. Defendant hired the former MDT workers supplied by Mr. Zuniga at a lower hourly rate than it had paid MDT.[18] Defendant did not pay for workers' lodging.

---

[14] Docket No. 73 at 140.

[15] Id. at 151.

[16] Id. at 152-53.

[17] Id. at 153.

[18] Id. at 148.

27. Drywall hanging on the Owensboro site concluded in October 2012 and the project was completed by June 2013.

28. At trial, Plaintiff relied almost entirely on witness testimony to support its damages claim, which originates from three sources: (1) costs associated with losing employees on the Owensboro Project, (2) opportunity costs incurred by MDT as it rebuilt its labor force, and (3) the rate difference between the Parties' first and final contracts, also described in testimony by Plaintiff's witnesses as costs related to the DOL audit.

29. As for the first source of damages, Plaintiff claims that replacing the employees lost at Owensboro cost the company $46,000.[19] Mr. Ivanov testified that the average cost to MDT to hire an employee is $600 and that approximately 80 employees were hired specifically for the Owensboro Project. He estimated 60 to 70 of the workers who moved to Cage eventually returned to MDT, but it took his company eight months to a year to build back up a full workforce.

30. To support this testimony, Plaintiff entered into evidence a table entitled "The Cost of Hiring an MDT Employee."[20] The Court affords this document little weight – it contains no date or other indication that it was created in the course of business rather than in anticipation of this litigation. The table lists time and cost estimates for various steps in the hiring process and arrives at a final cost per employee of $600. Some estimates are calculated in the aggregate and others per individual, though the document contains no identification to this effect. This approach creates wide ranges of estimates that are too indefinite to provide any reasonable basis for calculating damages. For example, the estimated time and cost for reviewing resumes is "(25

---

[19] Docket No. 75 at 15.

[20] Plaintiff's Exh. 19.

minutes to 21 hours) - $12.50-$525."[21]  Mr. Ivanov explained that this range includes review of one to hundreds of resumes.

31. Mr. Ivanov testified that re-hiring a worker who was previously employed at MDT also cost the company around $600.  However, Mr. Nunez contradicted this estimate when he testified that the cost to rehire a former employee is approximately $50.[22]

32. MDT management also testified to the extensive training that MDT employees received, which also increased the cost of replacing them.  However, this vague claim was not supported by MDT employees' testimony.  Jose Magana testified that employees did not receive training from MDT and instead learned "in the field."[23]  Similarly, Lorenzo Vazquez and Joseph Cox both testified that they came to MDT fully trained and with many years' experience.

33. Plaintiff's second source of damages is opportunity costs associated with the company's insufficient workforce.  To this end, Plaintiff entered into evidence invitations that it received to bid on projects between February and May 2012.[24]  Mr. Nunez testified that the company received 50 such invitations during that time period.  In normal circumstances, if MDT was not occupied with the Owensboro Project, it would "try to bid on most of them," depending

---

[21] Plaintiff's Exh. 19.

[22] Plaintiff seeks to resolve this conflict in its proposed "Conclusions of Fact and Findings of Law" by explaining the witnesses based their estimates on different groups of employees.  Mr. Ivanov testified it cost $600 each to replace 75 employees while Mr. Nunez referred to "20 of the 95 employees [who] came back" thus, "the cost to 'rehire' these 20 employees was only about $50.00."  (Docket No. 75 at 9).  The Court is not satisfied by this explanation.  If the 20 employees allegedly referred to by Mr. Nunez are workers who immediately departed Owensboro with the owners of MDT at the beginning of February 2012, then their employment never terminated and there would be no need to rehire them.  If they are employees who were hired by Cage, then there is no indication why rehiring them cost $550 less than the other 75 employees that MDT rehired from Cage.  At trial, the Court understood Mr. Nunez to be referring to the same population of employees as Mr. Ivanov and concludes the conflicting testimony is just that.

[23] Docket No. 71 at 122.

[24] Plaintiff's Exh. 17.

on factors including "the availability of workers."[25]  He estimated MDT generally gets 10% of the projects it bids on.  While Plaintiff employed an additional 200 workers on other projects in early in 2012, all were otherwise occupied and MDT lacked the labor to bid on any of the invitations exhibited.

34.  The only additional evidence presented on opportunity costs was witness testimony, which did little to reinforce a causal connection between Defendant's breach of the non-solicitation/no-hire clause and Plaintiff's subsequent failure to obtain alternate projects.  For example, during Mr. Ivanov's cross-examination, the witness attributed its failure to bid on alternative projects to Defendant before the alleged theft of workers occurred:

> Q: [D]id you bid on the EMG Corporation bid on January the 9th?
> A: I said no.
> Q: Why not?
> A: Because we didn't have the workers.  Cage stole our workers.
> Q: Well, my understanding was that Cage – that the employees quit on January 29th.  And you told the Court at the time that you had a workforce of over 300 laborers.  On January the 9th a hundred of your laborers were up in Owensboro.  Sir, are you trying to tell the Court that you didn't make a bid on January the 9th because Cage stole your employees?
> A: Yes.  That's what I'm saying.[26]

35.  Plaintiff's third source of damages concerns an unpaid invoice sent by Plaintiff to Defendant on March 22, 2012.  The results of the DOL audit were released that spring.  The audit assessed various violations by MDT against its employees, including failure to pay overtime prior to December 15, 2011, loans to employees, fines for alleged misconduct, and fees for drug tests and tools.  MDT was apprised of the findings and given the opportunity to

---

[25] Docket No. 73 at 28.

[26] Id. at 9.

negotiate the prospective fines. The DOL concluded MDT owed a total of $14,413.25 to 108 employees.[27]

36. While negotiating with the DOL, Plaintiff sent Defendant an invoice for $136,821.77, for which Mr. Ivanov offered various explanations at trial.[28] First, he explained this amount represented MDT's costs related to the audit. With MDT's net profits at approximately 20%, Plaintiff planned to retain approximately $27,000 of the $136,821.77 as profit, and pay the remainder to the employees identified in the DOL audit.

37. This explanation falls short, as the Court noted at trial, because the total amount of penalties associated with the audit is $14,413.25. Though the initial sum before negotiations between MDT and the Department of Labor might have been much higher,[29] only the actual cost to MDT is relevant. Mr. Ivanov pointed out that the results of the audit by the Kentucky Labor Board are still pending and may include further fines. However, this is also irrelevant to a damages inquiry, as Plaintiff cannot recover for injuries that are at best speculative.

38. Based on subsequent testimony and Plaintiff's submissions, it appears the invoice actually represented the difference between the hourly rates specified in the first contract and the higher rates/overtime in the final contract applied to all hours worked between September 11 and December 8, 2011. Plaintiff asserts that the Parties' agreement to apply the higher rates retroactively was enshrined in the following provision of the final contract: "The rates bellow

---

[27] Plaintiff's Exh. 25.

[28] Plaintiff's Exh. 22.

[29] Mr. Ivanov pointed out that the $14,413 figure was the product of negotiation with the DOL and that the original amount owed was around $136,821.77. As the Court explained at trial, MDT can recover no more than its actual losses.

[*sic*] to be in force for all projects where MDT provides manpower for Cage Drywall except for projects requiring certified payroll reporting."[30]

39. Plaintiff also claims that Cage made oral representations to this effect, which Defendant vehemently denies. Mr. Ivanov testified that during negotiations for the final contract, he emphasized the "need to have everything done right from the beginning" in light of the DOL investigation.[31] Mr. Ivanov was concerned that MDT might be required to reimburse workers for overtime they were entitled to as statutory employees prior to the audit. Cage representatives assured him "when we cross that bridge, then we're going to take care of it," which he interpreted as a promise to retroactively apply the rates and overtime provision set forth in the final contract to the previous months' work.[32] Mr. Ivanov testified it was "[his] mistake" not to include this agreement in the final contract.[33]

40. The description above summarizes Plaintiff's claims for damages. No evidence was offered at trial concerning how many of Plaintiff's former employees remained with Defendant to work on the Owensboro Project, how many hours they worked per week, in what capacity, or at what hourly rate. No evidence was offered on how long former MDT employees remained on the Owensboro Project. Plaintiff was unaware of when the project was completed.

41. Plaintiff's proposed "Conclusions of Fact and Findings of Law" sought to resolve this hole in the evidentiary record by summarizing Mr. Ivanov's testimony as follows:

> Mr. Ivanov explained that the Cage Project was not the value to MDT but it was the MDT employees that were of value to MDT because, if any employee left the Cage project at any time, or if all

---

[30] Plaintiff's Exh. 13.

[31] Docket No. 71 at 63.

[32] Id. at 63.

[33] Id. at 67.

of them left then [*sic*] next day after January 30, 2012, then MDT had sufficient other projects to send the temporary employees to, resulting in no diminution in profits if Cage had not hired them away.[34]

Therefore, Plaintiff concludes, its failure to collect this information during discovery did not negatively affect its claim for damages.

42. Plaintiff requests the Court order Defendant to pay "$46,000 for the costs of hiring replacement employees; $532,000 in lost profits; $14,413 for the audit reimbursement; and $121,587 for the unpaid invoice ($136,000-$14,413 = $121,587)" for a grand total of $714,000.00.[35]

43. At the conclusion of the bench trial, Defendant repeated a charge made in its pre-trial filings that Plaintiff was forum shopping and had "the same or similar claims pending in Daviess County Circuit Court." (Docket No. 66 at 2). Defendant requested that Plaintiff's claims be dismissed under Rule 41 of the Federal Rules of Civil Procedure. The Court declined to address this issue and limited its consideration to the matters before it, namely the breach of contract and related claims.

44. Based on the foregoing, the Court finds the following facts by a preponderance of the evidence:

(A) Defendant hired MDT workers in violation of the "non-solicitation/no-hire" provision of the Parties' final contract and Plaintiff was harmed as a result.

(B) The final contract did not address retroactive application of the hourly wages and overtime provision contained therein, nor did the Parties have any additional agreement on the subject.

---

[34] Docket No. 75 at 10.

[35] Id. at 15.

(C)  Plaintiff could not have reasonably interpreted or relied on Defendant's statements or actions as a promise to pay the final contract rates retroactively, or compensate Plaintiff for the costs of their violations from the DOL audit.

## II. <u>CONCLUSIONS OF LAW</u>

### A.  <u>Breach of Contract</u>

To prevail on a breach of contract claim, Plaintiff must show "'(1) the existence of an enforceable contract, (2) nonperformance amounting to breach of the contract, and (3) damages caused by the breach of the contract.'" <u>In re Estate of Beazley</u>, 2012 WL 3025176, at *4 (Tenn. Ct. App. July 24, 2012) (quoting <u>ARC Lifemed, Inc. v. AMC–Tenn., Inc.</u>, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).[36]

The existence of an enforceable contract, containing a non-solicitation/no-hire clause, is undisputed in this case.  The plain language of that clause clearly prohibited Defendant from hiring MDT workers.  However, Defendant offers multiple reasons why its actions do not constitute a breach.

First, witnesses for Defendant, Mr. Loftis and Mr. Carter, testified that they did not know the workers hired at the beginning of February came from MDT.  Yet, upon further questioning, the witnesses admitted that they did in fact recognize some workers.  Furthermore, Mr. Kinzer admitted in his deposition that he was aware MDT workers approached Mr. Zuniga and were subsequently hired by Cage.

Second, Defendant claims MDT workers quit in anger that they would not be paid on time and subsequently approached Mr. Zuniga and Mr. Kinzer for work.  Thus, Cage did not

---

[36] The Parties appear to agree that Tennessee law applies to their dispute.  Because Tennessee is Defendant's State of incorporation, and the contract was likely formed in Tennessee, the Court is satisfied there is sufficient basis to apply the law of this State.

solicit the workers at all. The Court notes it found Mr. Cox's testimony that Cage offered workers the choice between two sign-in sheets credible. However, even if this were not the case, Defendant's argument does not obviate the no-hire portion of the provision, which prohibits Cage from acting to "in any way engage, contract or hire, the employees supplied by MDT." (Plaintiff's Exh. 13). A preponderance of the evidence presented showed that former MDT employees were hired by Cage and received paychecks from Cage for some time after.

Third, Defendant points to Mr. Zuniga as the party "responsible for keeping the former MDT employees at work on the project." (Docket No. 63 at 4). Even if this assertion were credible, it would still breach the final contract, which enjoins Cage from engaging MDT employees "indirectly, by, as or through any affiliate or related company" including subcontractors, like Ponce Drywall (Plaintiff's Exh. 13).

Finally, in its Proposed Findings of Fact and Conclusions of Law (Docket No. 74 at 20), Defendant invokes the "first-to-breach" rule. Defendant asserts that Plaintiff "committed the first uncured material breach" and thus cannot recover for Defendant's subsequent breach of the contract. See White v. Empire Exp., Inc., 395 S.W.3d 696, 715 (Tenn. Ct. App. 2012) ("A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract.") (internal citations omitted). While this defense is untimely – not having appeared in Defendant's previous filings or the Pretrial Order – even if it was raised earlier, the Court would remain unconvinced.

The Court does not consider Plaintiff's ten-day delay of its internal payment schedule to be a material breach of the Parties' final contract. See DePasquale v. Chamberlain, 282 S.W.3d 47, 53-54 (Tenn. Ct. App. 2008) (setting forth the five factors Tennessee courts consider in determining whether "a breach is material such that the non-breaching party could avoid

performance"). In fact, the final contract does not obligate Plaintiff to provide any workers to Defendant. It simply sets forth the non-solicitation/no-hire covenant and specifies hourly rates "where MDT provides manpower." (Plaintiff's Exh. 13).

Having disposed of Defendant's arguments to the contrary, the Court concludes that Cage breached the Parties' final contract when it hired former MDT workers on the Owensboro Project. The issue of damages will be further considered below.

Plaintiff asserts an additional breach on the part of Defendant – the failure to pay the $136,000 invoice transmitted on March 22, 2012. Plaintiff claims the Parties agreed that "as a condition of the MDT employees returning to the job site, the unpaid overtime and other amounts due to the MDT workers for the period between September and December 2011, in the amount of $136,000, would be paid in full by Cage." (Docket No. 63 at 2). It points to the final contract provision stating the hourly rates therein apply to "all projects where MDT provides manpower for Cage Drywall."

Plaintiff's interpretation reaches far beyond the plain language of the contract. The Court does not read the above quoted text to include any agreement to pay the final contract rates retroactively for work completed between September and December 8, 2011. Had this been the Parties' intention, which Defendant denies, it should (and, the Court believes, would) have been stated explicitly. The Court's understanding is supported by Mr. Ivanov's own testimony that the alleged agreement was not included in the contract and that the omission was "[his] mistake." (Docket No. 71 at 67). Therefore, Plaintiff fails the first element and cannot recover the invoice amount under a breach of contract theory.

## B. Unjust Enrichment and Promissory Estoppel

In the alternative, Plaintiff seeks to recover the $136,000 invoice under a theory of unjust enrichment. See Town of Smyrna, Tenn. v. Mun. Gas Auth. of Ga., 2012 WL 1313340, at *13 (M.D. Tenn. April 17, 2012) ("It is true that *recovery* may not be had under both a breach of contract and an unjust enrichment theory, but a party is allowed to plead alternative theories of recovery.") (citing FED. R. CIV. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency")); Wachovia Ins. Serv. Inc. v. Fallon, 682 S.E.2d 657, 665 (Ga. App. 2009) (citation omitted) ("A claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails").

Throughout its filings, Plaintiff has referred alternatively to theories of unjust enrichment, quantum meruit, promissory estoppel, detrimental reliance, and promissory fraud regarding the invoice.[37] Unjust enrichment and quantum meruit are "essentially the same" under Tennessee law and often "used interchangeably to describe that class of implied obligations where, on the basis of justice and equity, law will impose a contractual relationship between parties." Lakeside Realtors, Inc. v. Ross, 1990 WL 17212, at *1 (Tenn. Ct. App. Feb 28, 1990) (citing Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn. 1966)). Similarly, "Tennessee courts refer to claims of detrimental reliance and promissory estoppel interchangeably." Quik Find Plus, Inc. v. Procon, Inc., 2010 WL 2158808, at *6 (E.D. Tenn. May 25, 2010) (citing Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003)). For efficiency, the Court considers Plaintiff's equitable claims under unjust enrichment and promissory estoppel.

---

[37] To illustrate Plaintiff's interchangeable use of these equitable theories, the Court notes the Joint Proposed Pretrial Order omits reference to detrimental reliance (Docket No. 63), and Plaintiffs' proposed "Conclusions of Fact and Findings of Law" makes no mention of quantum meruit (Docket No. 75). The Court can find no mention of promissory fraud apart from the Complaint. Therefore, the Court considers this cause of action abandoned. Even if it had been properly plead, by the same reasoning applied to Plaintiff's unjust enrichment and promissory estoppel claims, a promissory fraud argument would not succeed.

The theory of unjust enrichment is "founded on the principle that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." Paschall's, Inc., 407 S.W.2d at 154. It includes three elements: "1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) (quoting Paschall's, Inc., 407 S.W.2d at 155); accord Hood Land Trust v. Hastings, 2010 WL 3928647, at *6 (Tenn. Ct. App. Oct. 5, 2010).

"A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005). "The most significant requirement ... is that the benefit to the defendant be unjust." Id. "The remedy for unjust enrichment requires that the person who has been unjustly enriched at the expense of another make restitution to that person." Chase Manhattan Bank, N.A. v. CVE, Inc., 206 F. Supp. 2d 900, 909 (M.D. Tenn. 2002) (citing Browder v. Hite, 602 S.W.2d 489, 491 (Tenn. Ct. App. 1980)).

Tennessee courts have described promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance." Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003) (quoting Alden v. Presley, 637 S.W.2d 862 (Tenn. 1982)). To prevail on this claim, Plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [Plaintiff] reasonably relied on the promise to [its] detriment." Chavez v. Broadway Elec. Serv. Corp., 245

S.W.3d 398, 404-05 (Tenn. Ct. App. 2007). "Tennessee courts generally disfavor claims based upon promissory estoppel: 'Tennessee does not liberally apply the doctrine … To the contrary, it limits application … to exceptional cases.'" Holt v. Macy's Retail Holdings, 719 F. Supp. 2d 903, 913 (W.D. Tenn. 2010) (citing Chavez, 245 S.W.3d at 406) (internal citations omitted).

Plaintiff asserts that it detrimentally relied on statements made by Defendant when Mr. Ivanov voiced concerns about potential problems related to the DOL audit. Specifically, Mr. Ivanov testified that Cage management stated "when we cross that bridge, then we're going to take care of it," which he took to be a promise by Cage to apply the final contract rates retroactively to the period governed by the Parties' first contract (September 11 to December 8, 2011) (Docket No. 71 at 63). Plaintiff states that Defendant was "unjustly enriched by the $136,000 in unpaid services" as a result (Docket No. 63 at 5).

The evidence presented at trial does not show Defendant made any promise to pay the final contract rates retroactively. The "cross that bridge" comment and the unspecified "we" is simply insufficient, particularly in light of the high bar set by Tennessee courts regarding promissory estoppel.

Similarly, the Court fails to see what uncompensated benefit Defendant received from Plaintiff. Certainly, Defendant received the benefit of Plaintiff's continued supply of workers to the project. However, Plaintiff was compensated for this service with the increased hourly and overtime rates memorialized in the final contract. It was not inequitable for Defendant to retain this service because Defendant paid for its value. Plaintiff fails to satisfy its burden under unjust enrichment and promissory estoppel.

## C. **Tortious Inducement**

Plaintiff made passing reference throughout its filings to the claim that "Cage tortuously [*sic*] interfered with the contractual relations MDT had with each of its employees" (Docket No. 63 at 5), but never developed the assertion to even the minimal standard of Rule 8 of the Federal Rules of Civil Procedure 8. See FED. R. CIV. PRO. 8(a)(2) ("A pleading that states a claim for relief must contain: a short and plain statement of the claim showing that the pleader is entitled to relief.") The Court treats the issue very briefly for the sake of completeness.

To prevail on a claim of tortious inducement, Plaintiff must show (1) "an existing business relationship with specific third parties," (2) that "defendant [knew] of the relationship, and (3) intended "to cause the breach or termination of the business relationship," (4) defendant has "improper motive" or used "improper means," and (5) plaintiff suffered injury from this tortious interference. Watson's Carpet and Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007) (citing Trau–Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691 (Tenn. 2002)).

Plaintiff never exhibited a current example of the contract it enters with its workers. The only similar document entered into evidence was an outdated "Independent Contractor's Agreement and Release" provided by Defendant (Defendant's Exh. 2). Without this information, the Court cannot determine the specifics of the business relationship between MDT and its employees. Moreover, the evidence presented at trial did not show by a preponderance that Defendant intended to cause a breach of this relationship when it hired the employees. Multiple witnesses for the Defense stated Cage's intention was to maintain a sufficient workforce to complete work on the Owensboro Project on time. To the extent that Plaintiff seeks to recover under a theory of tortious interference, this effort fails.

**D. Damages**

Having found Defendant breached the non-solicitation/no-hire covenant in the Parties' final contract, the next issue is the appropriate award of damages.

Plaintiff relies heavily on Waggoner Motors, Inc. v. Waverly Church of Christ, 159 S.W.3d 42 (Tenn. Ct. App. 2005), for the proposition that it need only show a breach occurred in order to recover damages equal to its calculation of lost profits. It concludes that "MDT established from relevant and comparative historical data a clear pattern of net profits on the actual Cage project, and similar projects that were available during the 8-10 month period it took MDT to replace the stolen employees." (Docket No. 75 at 13). However, the Court reads Waggoner very differently.

In Waggoner, the Tennessee Court of Appeals modified the judgment of the trial court to reduce the amount of damages awarded to the plaintiff, an automotive dealer whose inventory had been damaged by paint spray from construction at the church next door. In calculating the adjusted damages, the court found that "Waggoner's financial records provided an appropriate basis for calculating its anticipated future profits." Waggoner, 159 S.W.3d at 63-64. However, the court noted that "if the only evidence of Waggoner's lost profits consisted of Mr. Waggoner's and [plaintiff's expert witness']38 testimony, we would have no alternative other than to conclude that Waggoner was not entitled to damages even though it had presented adequate evidence that its business had been damaged." Id. at 64.

The Court here finds itself in a similar situation to the one hypothesized by the Waggoner court, as Plaintiff relies primarily on witness evidence to establish its lost profits. The previous months' earnings on the Owensboro Project are not an accurate proxy from which to extrapolate,

---

38 The court noted that the plaintiff's expert witness performed only an "ordinary examination" of plaintiff's financial statements, which "required no economic expertise to comprehend." Waggoner, 159 S.W.3d at 61.

given September to mid-December 2011 was governed by a different contract, with different hourly rates, and a variable number of workers. January 2012 is the only complete month when the final contract rates were in force. However, by Plaintiff's own admission, January was a very unusual month with net profits three times higher than usual. Furthermore, Plaintiff offered little evidence concerning alternative projects available in the year following Defendant's breach of the contract, and admitted that had the Owensboro Project proceeded according to plan, it would not have bid on any additional projects anyway.

Given the scant evidentiary record on which to calculate damages, the Court has not definitely decided the appropriate amount to be awarded to Plaintiff, and will give the Parties an opportunity to pursue settlement of this case now that Defendant's liability has been decided. The Parties are strongly urged to make full use of this opportunity to reach a resolution of this matter that is mutually agreeable and to negotiate in good faith.

Although the Court defers final ruling on the appropriate remedy, the Court has made some preliminary determinations and makes certain observations which may benefit the Parties' negotiations:

"Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001) (citation omitted). This is because "[t]he purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than she would have been if the contract had been fully performed." Id. Moreover, Plaintiff has the

"burden of proving the damages sustained," and, "[w]hile damages do not have to be proved exactly, they must be proved with a reasonable degree of certainty to allow the trier of fact to make a fair assessment without speculation." Stonecipher v. Estate of Gray, 2001 WL 468673, at *6 (Tenn. Ct. App. 2001).

### III. CONCLUSION

On the basis of the foregoing, the Court will enter an Order finding in favor of Plaintiff and against Defendant on Plaintiff's claim for breach of contract insofar as it relates to Defendant's breach of the non-solicitation/no-hire provision. The Court will defer ruling on the appropriate award of damages, and strongly encourages the Parties to use this opportunity to explore the possibility of settling this case.

Kevin H. Sharp
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE