UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MDT SERVICES GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-cv-1080 |
| | ) | |
| CAGE DRYWALL, INC. | ) | Judge Sharp |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The Court is informed by the Magistrate Judge that Plaintiff MDT Services Group, LLC ("MDT") and Defendant Cage Drywall, Inc. ("Cage") have failed to reach a settlement. (Docket No. 86). After the bench trial on July 15-17, 2014, the Court found in favor of Plaintiff on its breach of contract claim relating to Defendant's breach of a non-solicitation/no-hire provision, but deferred ruling on damages. "Given the scant evidentiary record," the Parties were given the "opportunity to pursue settlement of this case now that Defendant's liability has been decided." (Docket No. 80 at 22). Since this effort has failed, the Court takes up the matter once again. For the reasons set forth below, Plaintiff will be awarded damages in the amount of $112,945.55.

### I. Analysis

"The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed." BVT v. Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001) (citation omitted). Plaintiff bears the burden of proof and while "damages do not have to be proved exactly, they must be proved with a reasonable degree of certainty to allow the trier of

1

fact to make a fair assessment without speculation." Stonecipher v. Estate of Gray, 2001 WL 468673, at *6 (Tenn. Ct. App. 2001).

Plaintiff claims damages from three sources: (1) $46,000 to hire replacement employees; (2) $532,000 in lost profits; and (3) an unpaid invoice for $136,000. (Docket No. 80 at 8 & 13). In total, Plaintiff seeks an award of $714,000.00. (Docket No. 75 at 15). However, as noted at trial, Plaintiff is plagued by a paucity of evidence and cannot recover the full amount it desires. There is minimally sufficient evidence to support an award of damages based on costs associated with losing workers and lost profits on the Owensboro project, but the remaining claim regarding the invoice is entirely too speculative to provide any degree of certainty and will not be awarded. Before setting forth the damages calculation, the Court dispenses with the insufficient claim.

**A. Plaintiff's Damages Relating to Unpaid Invoice**

The invoice for $136,821.77 has already been considered in detail in the prior Order. It is comprised of two separate sums: $14,413 in fines incurred as a result of a Department of Labor ("DOL") audit in Fall 2012, and a charge for $121,587, which Plaintiff's calculates is the difference between the hourly rates specified in the Parties' first and final contracts.[1] Neither justification warrants an award of damages.

First, the total amount of penalties associated with the audit was $14,413.25, thus any greater sum does not represent MDT's actual costs. See BVT Lebanon Shopping Ctr., 48 S.W.3d at 136 ("[T]he nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than she would have been if the contract had been fully

---

[1] The first contract governed the Parties' relationship between September 11 and December 8, 2011. The Parties later revised the contract when MDT became the main supplier of labor to the Owensboro project and the DOL audit revealed its workers were owed overtime. The resulting final contract included a higher hourly rate and an overtime rate. It was in force only for the month of January 2012 before Defendant breached its non-solicitation/no-hire provision and the majority of MDT's workers moved to Cage. As previously determined by the Court, the final contract did not provide for retroactive application of the higher rate and overtime.

2

performed."). When this disparity was raised at trial, witnesses for MDT pointed out that the results of a second audit by the Kentucky Labor Board were still pending and could include further fines. As the Court has previously observed, hypothetical future fines are "irrelevant to a damages inquiry, as Plaintiff cannot recover for injuries that are at best speculative." (Docket No. 80 at 11).

Second, the Court found the final contract did not provide for retroactive application of the higher hourly rate and overtime rate in the final contract. Nor could Plaintiff "have reasonably interpreted or relied on Defendant's statements or actions as a promise to pay the final contract rates retroactively, or compensate Plaintiff for the costs of their violations from the DOL audit." (Docket No. 80 at 13-14). Plaintiff has not satisfied its burden to prove damages regarding the unpaid invoice.

### B. Plaintiff's Damages Relating to Loss of Employees

While the claim for $46,000 allegedly incurred as MDT replaced its employees also suffers from a general dearth of support, Plaintiff's modicum of evidence on this point provides a reasonable degree of certainty to calculate at least a portion of its claim.

The Court afforded little weight to Plaintiff's table entitled "The Cost of Hiring an MDT Employee," which set the average cost of hiring each employee at $600.[2] To further muddy the waters, witness testimony on this point was conflicting. MDT managing partner George Ivanov testified that approximately 60 to 70 of the workers who moved to Cage eventually returned to MDT over the subsequent months and that it cost $600 to rehire each one. (Docket No. 72 at 10-

---

[2] The table "contain[ed] no date or other indication it was created in the course of business rather than in anticipation of this litigation." (Docket No. 80 at 8). The Court observed that "[s]ome estimates are calculated in the aggregate and others per individual, though the document contains no identification to this effect. This approach creates a wide range of estimates that are too indefinite to provide any reasonable basis for calculating damages." (Id.).

3

12). His fellow managing partner and MDT CEO Luis Nunez testified that 20 employees returned and that it cost approximately $50 to rehire each of them. (Docket No. 73 at 66 & 89). The Court finds Mr. Nunez' testimony credible in this regard and will award Plaintiff the cost to rehire each of the 20 workers at $50 per worker.

### C. Plaintiff's Damages Relating to Lost Profits

"Lost or expected profits are recoverable as damages if they are shown to be a consequence of the breach, provided the amount can be proved with reasonable certainty." Baker v. Hooper, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001) (citing Morristown Lincoln–Mercury, Inc. v. Roy N. Lotspeich Publishing Co., 298 S.W.2d 788 (1956)). Plaintiff's failure to conduct discovery regarding how many of its former workers were retained by Cage, how long they worked and at what pay rate, makes establishing lost profits in this case exceedingly challenging. The Court is mindful that "[a]n omission by a party to produce evidence in elucidation of the subject-matter in dispute which is within his capabilities and peculiarly within his own knowledge, 'frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.'" Baker, 50 S.W.3d at 470 (citing Doughty v. Grills, 260 S.W.2d 379, 391 (1952)). What little evidence Plaintiff has offered in this regard draws the Court perilously close to the edge of speculation as it seeks a reasonable basis upon which to determine lost profits.

At trial, Plaintiff sought to make up for this lack of evidence by exhibiting invitations to bid on other projects that it received between February and May 2012. (Plaintiff's Exh. 17). Plaintiff asserted these provided "relevant and comparative historical data" that established "similar projects" available to MDT while it replaced its workforce. (Docket No. 75 at 13). MDT managing partners testified that if MDT had not been engaged in Owensboro, it would

generally bid on most of the invitations it received and would likely win approximately 10% of its bids. (Docket No. 73 at 28). When its employees moved to Cage unexpectedly, Plaintiff claims it was left without a sufficient workforce to pursue other opportunities. MDT did not offer any evidence that it actually pursued alternative projects during this period.

The Court does not find this evidence relevant to its assessment of lost profits. Had Cage not breached the non-solicitation/no-hire provision, it is likely the MDT workers would have continued for the duration of the project as needed, and Cage would have paid MDT at the rates specified in the Parties' final contract. However, an award of "opportunity costs" for unrelated projects that MDT might have pursued in the future bears no relation to the position MDT would have been in absent the breach by Cage.

Moreover, Plaintiff did not show that its subsequent inability to retain other work was the result of Defendant's breach. See e.g., Developers Diversified of Tennessee, Inc. v. Tokio Fire and Marine Ins. Co., 2014 WL 956244, at *8 (M.D. Tenn. March 12, 2014) ("'In actions of contract, generally speaking, the damages are limited to the natural and proximate consequence of the breach complained of, and damages remotely or consequentially resulting therefrom or merely speculative damages, cannot be claimed.'") (citing Walker & Langford v. Ellis & Moore, 33 Tenn. (1 Sneed) 515, 1853 WL 2312, at *4). In fact, witness testimony at trial revealed that MDT declined to pursue additional projects even before its workers departed for Cage. (Docket No. 73 at 9).

Plaintiff also relied on Waggoner Motors v. Waverly Church of Christ for the proposition that the "best evidence of lost profits is a comparison of the experience of the injured party's own business before and after the wrongdoing." 159 S.W.3d 46, 59 (Tenn. Ct. App. 2004). To this end, it sought to fulfil its burden of proof by showing what it characterized as "a clear

pattern of net profits on the actual Cage project," primarily through with witness testimony. (Docket No. 75 at 13).

It is unlikely this evidence would have satisfied the Waggoner Motors court, which observed that "if the only evidence of [plaintiff's] lost profits consisted of [witness] testimony, we would have no alternative other than to conclude that Waggoner was not entitled to damages even though it had presented adequate evidence that its business had been damaged." 159 S.W.3d 46 at 64. Here, the Court finds itself dangerously close to this situation described in Waggoner. Aside from witness testimony, Plaintiff has little else to establish changes to its business over the course of the project. "[T]he previous months' earnings on the Owensboro Project are not an accurate proxy from which to extrapolate, given September to mid-December 2011 was governed by a different contract, with different hourly rates, and a variable number of workers." (Docket No. 80 at 21-22).

Plaintiff has since made a supplemental filing to draw the Court's attention to a recent Tennessee Court of Appeals decision, Borla Perf. Ind., Inc., v. Universal Tool and Eng., Inc., 2015 WL 3381293 (Tenn. Ct. App. May 26, 2015). Plaintiff contends this decision supports its position that,

> evidence of the amount of lost profits is sufficient where the drop in monthly net profits is closely tied in time to the breach of contract, *and* there was no contrary evidence presented by the defendant or otherwise such as economic downturns, increased costs, or other evidence explaining the sudden drop in net monthly profits, that also continued until the workforce was replaced.

(Docket No. 87 at 1).

Once again, the Court's reading of this case differs dramatically from Plaintiff's. The quote above seems to go to a question of causation, that is, whether to attribute existing evidence of damages presented to a particular event – presumably Defendant's breach. The rub in

Plaintiff's case is not causation but rather quantification, given the slimmest of reeds of any evidence at all beyond speculative witness testimony. Furthermore, plenty of contrary evidence was presented at trial to cast serious doubt on Plaintiff's position regarding damages.

The Court is at a loss to understand how Borla is helpful to Plaintiff's position. There, the Court of Appeals affirmed the trial court's determination that the plaintiff had failed to prove that it incurred lost profits as a result of the defendant's breach of contract. 2015 WL 3381293, at *14. The court noted, "the trial court quite rationally observed that Borla would have been well served to provide documentation of the lost or cancelled sales that it alleged were the cause of its financial losses." Id. at 8. It also repeated the lesson of Waggoner Motors, Inc. that "[p]arties seeking to recover lost profits damages would be well advised to provide the best available proof as to the amount of their loss that the particular situation permits." Id. (citing 159 S.W.3d at 58 n.29). This is the common thread between Burla and the current case: both Borla and MDT failed to put forth the best available proof and, as a result, failed to assert the damages sought with reasonable certainty. Fortunately for Plaintiff, mindful of Defendant's clear breach, the Court concludes that all is not lost.

The Court has scoured the record for some indication of what MDT's position would have been had Cage not breached the contract. As noted, the payroll records from September to December 2011 are of little use. The January 2012 payroll record provides a sounder basis for extrapolation, as it is the only complete month when the final contract rates were in force. "[B]y Plaintiff's own admission, January was a very unusual month with net profits three times higher than usual." (Id.). However, there is no indication that the new variables introduced in January (*e.g.*, adoption of the final contract with higher hourly rate and overtime provisions, an increase in the number of MDT workers) would not have continued at least for a short time. There is no

evidence in the record to suggest the final contract would not have remained in place. Furthermore, aside from fluctuations based on needs at the work site, there is no indication that MDT would not have remained the main supplier of labor on the Owensboro project.

In assessing Plaintiff's lost profits, the Court is faced with conflicting interests. On one side, it is restrained from awarding Plaintiff damages based on mere speculation. On the other, the notion that Defendant should be excused from compensating Plaintiff for its clear breach of contract is unjust as well as untenably irksome. See Waggoner Motors, 159 S.W.3d at 58 ("[D]efendants should not be permitted to complain about the lack of exactness or precision in the proof regarding the amount of damages when their wrongdoing created the damages in the first place."). In the spirit of balance, the Court concludes there is minimally sufficient evidence on the record to extrapolate MDT's earning from January 2012 for one month of lost profits, February 2012. However, due to the rapid pace of developments typical of construction projects, the Court cannot say with any reasonable degree of certainty what MDT's profits might have been if Defendant had not breached the contract and MDT had continued on the Owensboro project beyond February 2012. Consequently, the Court's calculations are as follows.

Witness testimony and payroll records from January 2012 support an estimate of $30,000 in net profits to MDT each week in the month of January, for a total of $120,000 for four weeks or a daily net profit of $5,454.55. (Docket Nos. 72 at 8-9, 54 & 73 at 38-39; Plaintiff's Exh. 18). Because there were 21 workdays in February 2012, the daily net profit equals a total of $114,545.55 for that month. From this amount, the Court deducts $2,600, which is MDT's estimated net profit for the week of February 5, when its workforce was reduced to 16. (Docket No. 72 at 9). Therefore, had Defendant not breached the non-solicitation/no-hire provision of the contract, the Court concludes with a reasonable degree of certainty that Plaintiff would have

8

made a net profit of $111,945.55 for the month of February. Finally the Court adds $1,000, or $50 for each of the 20 employees that Mr. Nunez testified was eventually rehired by MDT from the Owensboro project.

## II. Conclusion

Based on the reasoning and calculation set forth above, Plaintiff will be awarded $112,945.55 in damages. An appropriate order will enter.

The Clerk of the Court shall enter Final Judgment in a separate document in accordance with Rule 58 of the Federal Rules of Civil Procedure.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE